IN RE the COMMITMENT OF Richard D. SUGDEN:

STATE of Wisconsin,
Petitioner-Respondent,

v.

Richard D. SUGDEN,
Respondent-Appellant.†

Court of Appeals

*No. 2009AP2445. Submitted on briefs June 8, 2010.
—Decided November 18, 2010*

2010 WI App 166

(Also reported in 795 N.W.2d 456.)

† Petition for Review denied 2-7-11.

628

630

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Donald T. Lang*, assistant state public defender.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *Maura FJ Whelan*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

Before Vergeront, P.J., Lundsten and Sherman, JJ.

¶ 1. VERGERONT, P.J. Richard Sugden appeals the judgment entered on a jury verdict determining that he is a sexually violent person and committing him pursuant Wis. Stat. ch. 980 (2007–08).[1] He also appeals the circuit court's order denying his motion for a new trial based on newly discovered evidence and in the interests of justice. In affirming the judgment and the order, we conclude as follows.

---

[1] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

¶ 2. First, we affirm the circuit court's newly discovered evidence ruling that the new risk percentages for the Static 99—one of the risk assessment instruments used by two of the experts—do not entitle Sugden to a new trial. We conclude it is not reasonably probable that a jury considering both this new evidence and the evidence submitted at trial would have a reasonable doubt that Sugden meets the standard for commitment as a sexually violent person.

¶ 3. Second, we conclude the circuit court did not erroneously exclude part of an expert's report under the rule of completeness. More specifically, the rule of completeness did not require that the jury be informed that, if Sugden were released, his risk of reoffending was diminished by the fact that he would be supervised on parole for twenty-two years and until he is seventy-four years old.

¶ 4. Third, we decline Sugden's request to exercise our discretionary power of reversal on the ground the real controversy has not been fully tried. In arriving at this decision, we agree with Sugden that evidence on postcommitment annual reviews, postcommitment treatment, and the initial screening process for potential Wis. Stat. ch. 980 commitment was not relevant. Had objections been made, this irrelevant evidence should have been excluded. However, we conclude that this inadmissible evidence did not prevent the crucial issues from being fully tried.

## BACKGROUND

¶ 5. Sugden was convicted of rape, sexual perversion, first degree sexual assault, and abduction for incidents involving two women in 1976.[2] While he was

---

[2] The rape and sexual perversion charges were under Wis. Stat. §§ 944.01 and 944.17(1) (1973), respectively, and the

in prison serving the sentences for these crimes, he was convicted of and sentenced for attempted escape and taking a hostage. Shortly before Sugden's mandatory release date of June 27, 2007, the State filed a petition alleging that he is a sexually violent person within the meaning of WIS. STAT. § 980.01(7). That section defines a sexually violent person as

> a person who has been convicted of a sexually violent offense . . . and who is dangerous because he or she suffers from a mental disorder that makes it likely that the person will engage in one or more acts of sexual violence.[3]

¶ 6. At trial, the State called Dr. Janet Page Hill as an expert witness. She diagnosed Sugden as suffering from sexual sadism, paraphilia NOS (not otherwise specified) nonconsent,[4] and personality disorder NOS with antisocial and paranoid features, each of which, in her opinion, predisposes Sugden to engage in acts of sexual violence. The basis for the sadism and paraphilia diagnoses were details of the two rapes and of his sexual treatment of his wife during that same time period. Based on certain characteristics of these two diagnoses,

---

sexual assault and abduction charges were under §§ 940.225(1)(b) and 940.32(3) (1975), respectively.

[3] A "mental disorder" is defined as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." WIS. STAT. § 980.01(2). "Likely" means more likely than not. § 980.01(1m).

[4] According to Dr. Hill's testimony, paraphilia, in general, means sexual arousal by something that is unusual or inappropriate and the essential features are recurring, intense, sexually arousing fantasies, sexual urges or behaviors. "Paraphilia nonconsent" means the person is sexually aroused by the nonconsent of the victim.

Sugden's scores on actuarial risk assessment instruments, his score on the Psychopathic Checklist Revised, his refusal to be involved in treatment and other relevant dynamic factors,[5] she opined that it is more likely than not that he will commit future acts of sexual violence.

¶ 7. The defense expert, Dr. Luis Rosell, disagreed with Dr. Hill's diagnosis, testifying that in his opinion there was insufficient evidence for a diagnosis of sexual sadism and paraphilia. While he agreed with the diagnosis of personality disorder NOS with antisocial features, in his opinion this disorder does not affect Sugden's ability to control his behavior and, thus, he does not have a mental disorder that predisposes him to sexual violence. Because of this opinion, Dr. Rosell did not assess the risk of Sugden committing future acts of sexual violence.

¶ 8. Dr. Lori Pierquet, an expert appointed by the court, was also called as a witness for the defense. Like Dr. Rosell, she diagnosed Sugden as having personality disorder with antisocial features and did not believe this disorder predisposes him to commit sexually violent acts. While recognizing that the absence of a qualifying mental disorder means that a person does not meet the definition of sexually violent under WIS. STAT. § 980.01(7), Dr. Pierquet nonetheless undertook a risk assessment. Using the three actuarial instruments and the Psychopathic Checklist Revised used by Dr. Hill, and considering Sugden's history and relevant dynamic factors, Dr. Pierquet concluded that the risk of Sugden committing future sexually violent acts is more likely than not.

---

[5] Dynamic factors are those that change over time and include, among others, health, age, and sex offender treatment.

¶ 9. Additional testimony of the experts as well as testimony of non-expert witnesses will be discussed later in the opinion.

¶ 10. The jury found that Sugden was a sexually violent person and the court entered judgment accordingly. Sugden filed a motion for a new trial and the circuit court denied the motion.

## DISCUSSION

¶ 11. In the following sections we address and reject Sugden's assertions that he is entitled to a new trial based on newly discovered evidence, that the circuit court erred in excluding evidence, and that we should exercise our discretionary powers of reversal.

I. Newly Discovered Evidence

¶ 12. Sugden's claim of newly discovered evidence concerns the Static-99, one of the actuarial risk assessment instruments that Drs. Hill and Pierquet used in arriving at their conclusions on the likelihood of Sugden reoffending. Dr. Hill testified that Sugden scored a six on this instrument and that this corresponded with a 52% likelihood of being reconvicted of a sexually violent offense within fifteen years. Dr. Pierquet testified that she arrived at the same score as Dr. Hill and agreed that the corresponding risk percentage was 52%. Neither Dr. Hill nor Dr. Pierquet testified on the corresponding five- and ten-year recidivism rates, but their reports, both admitted into evidence, stated that the five-year recidivism rate was 39% and the ten-year rate was 45%.

¶ 13. In his motion for a new trial Sugden attached more recent Static-99 risk percentages—that is, percentages showing the risk of being reconvicted of a

sexually violent offense—based on more recent population samples. These new risk percentages have apparently not yet been developed for fifteen years from release, but only for five years and ten years. According to the new risk percentages, a person, like Sugden, with a score of six has a 13.4% likelihood of being reconvicted of a sexually violent crime within five years if the "Routine CSC Samples" are used and a 27.7% likelihood if the "Preselected High Risk Samples" (high risk samples) are used. For ten years, the percentages are 16.7% and 37.3%, respectively. Sugden is apparently assuming for purposes of his argument that the high-risk samples should be used for him and, thus, the new risk percentages for him would be a 27.7% chance of reconviction in five years and a 37.3% chance in ten years.

¶ 14. In order to be entitled to a new trial based on newly discovered evidence, Sugden must prove by clear and convincing evidence that (1) the evidence is, in fact, new; (2) his failure to discover the new evidence earlier was not due to his lack of diligence; (3) the evidence is material to an important issue in the case; and (4) the evidence is not cumulative. *State v. McCallum*, 208 Wis. 2d 463, 473, 561 N.W.2d 707 (1997). If the defendant proves these four elements by clear and convincing evidence, the circuit court decides whether a reasonable probability exists that a different result would be reached in a new trial. *Id.*

¶ 15. The State does not dispute that the four elements are met. The parties' dispute focuses on whether there is a reasonable probability that evidence of the new risk percentages would result in a different outcome. The inquiry on this point is whether there is

"a reasonable probability that a jury, looking at both the [old evidence] and the [new evidence], would have a reasonable doubt" that Sugden meets the standard for commitment as a sexually violent person. *State v. Plude*, 2008 WI 58, ¶ 33, 310 Wis. 2d 28, 750 N.W.2d 42 (citation omitted). In this inquiry the court should consider "whether a jury would find that the newly discovered evidence had a sufficient impact on other evidence presented at trial that a jury would have a reasonable doubt" that the standards for commitment have been met. *Id.*

¶ 16. A circuit court's decision whether to grant a new trial based on newly discovered evidence is committed to the circuit court's discretion. *Id.*, ¶ 31. We affirm a discretionary decision if the court applied the correct law to the facts of record and reached a reasonable result. *See State v. Williams*, 2001 WI App 155, ¶ 9, 246 Wis. 2d 722, 631 N.W.2d 623 (citation omitted). Failing to apply the correct legal standard constitutes an erroneous exercise of discretion. *Plude*, 310 Wis. 2d 28, ¶ 49. Whether the circuit court applied a correct legal standard constitutes a question of law, and our review on this issue is de novo. *Landwehr v. Landwehr*, 2006 WI 64, ¶ 8, 291 Wis. 2d 49, 715 N.W.2d 180.

¶ 17. Sugden contends the circuit court implicitly applied an incorrect legal standard because its ruling suggests that it analyzed the sufficiency of the other evidence to support the verdict. The State responds that the circuit court did apply the correct standard and reached the correct result. Our review leaves us uncertain whether the circuit court applied the correct standard. Accordingly, we will independently review the record. *See State ex rel. Treat v. Puckett*, 2002 WI App 58, ¶ 28, 252 Wis. 2d 404, 643 N.W.2d 515 (In certain

circumstances, we may independently review a discretionary decision to determine if it is a proper exercise of discretion.).

¶ 18. At the outset, we consider and reject Sugden's contention that an evaluation of him performed a year after his commitment is relevant to our analysis. Dr. Robert Barahal's re-examination report was prepared pursuant to WIS. STAT. § 980.07(1), which requires an annual re-examination of the mental condition of a person committed to determine "whether the person has made sufficient progress for the court to consider whether the person should be placed on supervised release or discharged." Dr. Barahal concluded that Sugden has a mental disorder that predisposes him to commit sexually violent acts and that he is not eligible for supervised release because he has not made significant progress in treatment in that he has never participated in sex offender treatment. However, Dr. Barahal recommended that the court consider discharge because in his opinion Sugden is not "more likely than not" to commit sexually violent acts if released. In arriving at this recommendation, Dr. Barahal employed the new risk percentages for the Static-99, using the high risk samples. Sugden contends that this report shows that "a government expert, applying the new risk percentage data, could conclude that Mr. Sugden does not satisfy the requisite level of dangerousness for commitment."

¶ 19. Sugden's argument misapprehends the proper inquiry. The fact that Dr. Barahal used the new risk percentages in arriving at his opinion does not make his report newly discovered evidence. We are concerned with whether there is a reasonable probability that a jury considering the new percentages and the evidence this jury heard from Drs. Hill and Pierquet, who used the old percentages, would have a reasonable doubt. The opin-

ion of an expert who did not testify at the trial does not have a bearing on how the new risk percentages would affect the opinions of Drs. Hill and Pierquet.

¶ 20. We begin our analysis of the impact of the new risk percentages by identifying the issues before the jury that are affected by the new percentages. The jury was asked to decide whether the State had proved beyond a reasonable doubt that Sugden (1) had been convicted of a sexually violent offense; (2) has a mental disorder that predisposes him to engage in acts of sexual violence; and (3) is dangerous to others because he has a mental disorder that makes it more likely than not that he will engage in one or more future acts of sexual violence. The new risk percentages have an impact only on the evidence going to the third element. As to this element, both Dr. Pierquet and Dr. Hill agreed that Sugden is more likely than not to commit future acts of sexual violence. Dr. Rosell did not offer any opinion on this topic, and so we do not address his testimony.

¶ 21. With respect to Sugden's risk of reoffending, Dr. Hill, like Dr. Pierquet, used the Static-99 as well as the RRASOR and the MnSOST-R. The new risk percentages for the Static-99 do not affect the score or the risk of reconviction or re-arrest derived from the other two instruments. On the RRASOR, Dr. Hill gave Sugden a score of three, which corresponds to a 48% likelihood of being convicted of a new sex offense within seventeen years, and an eleven on the MnSOST-R, which corresponds to a 54% likelihood of being arrested for a "new hands-on sexual assault" within six years. Dr. Pierquet arrived at the same results based on these two tests.

¶ 22. Sugden contends that the Static-99 was presented as the most reliable instrument of the three for

assessing him. Specifically, he points to Dr. Pierquet's testimony that the Static-99 is the most "studied" of the three instruments. He also points to Dr. Hill's testimony that the RRASOR is primarily sensitive to child offenders (which does not include Sugden) and that the original sample size for the MnSOST-R was based on a Minnesota population of 256 individuals. However, Sugden's argument on the importance of the Static-99 relative to the other two instruments overlooks the testimony of both Dr. Hill and Dr. Pierquet on the reasons *all* these instruments understate Sugden's risk of reoffending.

¶ 23. First, although the risk question for the jury was directed at the danger of Sugden committing a new sex offense, the risk instruments predict something different—the likelihood Sugden will commit a new offense *and be arrested or convicted.* The Static-99 and RRASOR predict convictions and the MnSOST-R predicts arrests. Dr. Hill testified that most people are not convicted for sexual offenses and "[s]o many men do sex offenses that never come to the attention of the authorities."

¶ 24. Second, the risks, according to all three instruments, relate to limited time periods in the future, whereas the WIS. STAT. § 980.01(7) definition is not time-limited. This has particular significance because the 37.3% for a score of six under the new Static-99 risk percentages is for ten years, and Dr. Hill's opinion was that even the seventeen years used on the RRASOR understated the risk. In Dr. Hill's view, the risk of reoffending does not decrease with age but increases because of the greater opportunity to reoffend.

¶ 25. Dr. Pierquet agreed with Dr. Hill that the three instruments underestimated the future risk for these same two reasons: the reconviction/re-arrest mea-

sure and the time periods. In Dr. Pierquet's view, Sugden's scores on all three instruments showed high risk, and she specifically included as an example of this high risk the 37% reconviction rate within ten years corresponding to Sugden's score under the RRASOR. This percentage shows a high risk, she explained, because "getting caught and appearing before a judge and being sentenced, [is] a very high threshold." There is no reason to believe that she would view the new Static-99 percentage of a 37.3% reconviction rate (using the "high risk" sample) within ten years as other than showing a high risk for these same reasons. Significant, too, is her testimony that, even if she had scored Sugden as a five rather than a six on the Static-99, she would consider a five to show a high risk. At the time, the risk percentage corresponding to a score of five on the Static-99 was 38% for ten years, essentially the same risk percentage as the new "high risk" samples yield for a score of six. This is further evidence that Dr. Pierquet would not view the new Static-99 risk percentages as showing less than a high risk for Sugden.

¶ 26. Sugden also overlooks the significant evidence besides the actuarial instruments on which Dr. Hill relied in arriving at her risk assessment. This evidence is unaffected by the new risk percentages. In her opinion, Sugden was "at extremely high risk to reoffend even beyond what actuarial instruments are showing." The basis for this opinion was the combination of his high score on the Psychopathic Checklist Revised and his sexual deviance, which corresponds to a 60% risk of being arrested for a new sexual offense within eight years. In addition, the diagnosis of antisocial personality, which in her view is also a qualifying mental disorder, in combination with the high psychop-

644

athy score, shows "a particularly intense form of antisocial personality disorder and that does not remit with age."

¶ 27. Dr. Pierquet, too, considered Sugden's high score on the Psychopathic Checklist Revised (she scored him one point lower than Dr. Hill) in arriving at her conclusion that he is more likely than not to commit a future act of sexual violence. However, because she disagreed with Dr. Hill's diagnosis of sexual deviance, she did not testify to an enhanced risk based on the interaction of that diagnosis with the high psychopathy score.

¶ 28. Both Dr. Pierquet and Dr. Hill agreed that Sugden's high risk of reoffending was not lowered by treatment because he had refused to participate in any sex offender treatment.

¶ 29. In short, we conclude that the evidence of the new risk percentages for the Static-99 is not sufficient to alter the opinions of Dr. Hill or Dr. Pierquet that Sugden is more likely than not to reoffend, and this new evidence has no impact on the other evidence presented at this trial. We therefore conclude there is not a reasonable probability that this new evidence would raise a reasonable doubt that Sugden meets the standard for commitment as a sexually violent person.

II. Exclusion of Evidence of Supervision/Doctrine of Completeness

¶ 30. Sugden invokes the rule of completeness in arguing that the circuit court erred in excluding a statement from Dr. Pierquet's report on future super-

vision of Sugden.[6] We first recite the pertinent facts and then address Sugden's specific argument.

¶ 31. On cross-examination, the prosecutor elicited from Dr. Pierquet confirmation of this statement from her report: "Mr. Sugden presents risk in terms of general antisocial behavior and complying with community rules. There is a risk for opportunistic sex offending." Defense counsel requested that the jury be allowed to hear the next sentence: "However, these risks should be mitigated by his 22 years of remaining parole supervision in the community until he is age 74–years-10–months old." The court denied the request.

¶ 32. Sugden acknowledges that in *State v. Mark*, 2006 WI 78, ¶ 41, 292 Wis. 2d 1, 718 N.W.2d 90, the supreme court held that evidence of conditions of Mark's probation supervision was irrelevant in determining whether he was a "sexually violent person" under Wis. Stat. § 980.01(7). He also acknowledges that in *State v. Budd*, 2007 WI App 245, ¶¶ 10–14, 306 Wis. 2d 167, 742 N.W.2d 887, we held that evidence that Budd would be on supervision upon release from prison was properly excluded. Sugden's position is that, despite this general rule of inadmissibility, once the State

---

[6] In his postcommitment motion and on appeal Sugden includes this excluded supervision evidence as one of the reasons the real controversy was not fully tried. However, because he requested that this evidence be admitted at trial, we first review the courts ruling in the framework of trial court error. Our conclusion that it was properly excluded means that the jury was not erroneously prevented from hearing this testimony and we therefore do not consider it in our real-controversy-not-tried analysis. *See State v. Hicks*, 202 Wis. 2d 150, 160, 549 N.W.2d 435 (1996) (real controversy may not be fully tried where the jury was *erroneously* not given the opportunity to hear important testimony that bore on an important issue of the case) (emphasis added).

read the preceding two sentences from Dr. Pierquet's report, § 901.07 requires that he be permitted to read the sentence on parole supervision.

¶ 33. WISCONSIN STAT. § 901.07, often called "the rule of completeness," provides: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the party at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Sugden points out that a circuit court may, in the proper exercise of its discretion, determine that the rule of completeness requires that an additional portion be introduced into evidence even if it is otherwise inadmissible. *See State v. Anderson*, 230 Wis. 2d 121, 140–41, 600 N.W.2d 913 (Ct. App. 1999). He asserts that the circuit court here erroneously exercised its discretion because it mistakenly applied the law. We disagree.

¶ 34. The rule of completeness gives a circuit court the discretion "to admit only those statements which are necessary to provide context and prevent distortion." *State v. Eugenio*, 219 Wis. 2d 391, 411–12, 579 N.W.2d 642 (1998). Statements about supervision are irrelevant to the issues the jury must decide in determining if a person is sexually violent within the meaning of WIS. STAT. § 980.01(7), and, in particular, are irrelevant to the issue whether a person is "dangerous because he or she suffers from a mental disorder that makes it likely that the person will engage in acts of sexual violence." *Mark*, 292 Wis. 2d 1, ¶¶ 37–41 (quoting § 980.01(7)). The two sentences the State read accurately present Dr. Pierquet's opinion on Sugden's dangerousness without consideration of supervision.

Introducing the next sentence to the jury misleads the jury by suggesting that it should take supervision into account in deciding whether it is likely that Sugden will reoffend.

¶ 35. We conclude the circuit court properly exercised its discretion in excluding the sentence on Sugden's parole supervision.[7]

### III. Discretionary Reversal—Real Controversy Not Tried

#### A. Legal Standard

■

¶ 36. Because Sugden did not object to the portions of Dr. Hill's testimony that he now asserts were erroneously admitted, he has forfeited the right to the review of these errors. *See State v. Romero*, 147 Wis. 2d 264, 274, 432 N.W.2d 899 (1988) ("In order to preserve an issue for appeal as a matter of right, a party must object to the error at trial . . ."). He does not claim ineffective assistance of counsel with respect to these claimed errors. Rather, he asks that we exercise our discretionary power of reversal.

---

[7] Sugden contends that a comment the court made, out of the jury's presence, in ruling on his request to have the supervision statement read shows that the court was impermissibly "severing" Dr. Pierquet's opinion on dangerousness from her opinion that Sugden does not have a predisposing mental disorder. We do not read the court's statement in this way. Moreover, we do not understand what this contention has to do with the admissibility of the statement on supervision from Dr. Pierquet's report. If Sugden is arguing that all Dr. Pierquet's testimony on risk should have been excluded because in her opinion Sugden did not have a qualifying mental illness, he does not develop this argument.

¶ 37. This court has the authority under WIS. STAT. § 752.35 to grant a new trial in the interest of justice when it appears that the real controversy has not been fully tried.[8] *Vollmer v. Luety*, 156 Wis. 2d 1, 19, 456 N.W.2d 797 (1990). The party seeking a new trial on this ground need not show a probable likelihood of a different result on retrial. *Id.* When, as here, a request for a discretionary reversal rests on the admission of evidence that was not objected to, courts have concluded the real controversy has not been fully tried when the jury had before it "evidence not properly admitted which so clouded a crucial issue that it may be fairly said that the real controversy was not fully tried." *State v. Hicks*, 202 Wis. 2d 150, 160, 549 N.W.2d 435 (1996) (citation omitted). The power to grant a new trial when it appears the real controversy has not been fully tried "is formidable, and should be exercised sparingly and with great caution." *State v. Williams*, 2006 WI App 212, ¶ 36, 296 Wis. 2d 834, 723 N.W.2d 719 (citation omitted). We exercise this power "only in

---

[8] WISCONSIN STAT. § 752.35 provides:

In an appeal to the court of appeals, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record and may direct the entry of the proper judgment or remit the case to the trial court for entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice.

exceptional cases." *State v. Chu*, 2002 WI App 98, ¶ 55, 253 Wis. 2d 666, 643 N.W.2d 878 (citation omitted).

¶ 38. In subsection B, we divide the challenged testimony of Dr. Hill into three categories, tracking the arguments of the parties: postcommitment annual reviews, postcommitment treatment, and the screening process. Within each category we identify each piece of testimony that Sugden challenges and determine whether it would have been admissible if there had been an objection. We do this because we look at "evidence *not properly* admitted" in deciding whether evidence the jury heard "so clouded a crucial issue that it may be fairly said that the real controversy was not fully tried." *See Hicks*, 202 Wis. 2d at 160 (citation omitted) (emphasis added). In subsection C, we analyze all the evidence we have identified as inadmissible to determine whether it so clouded the crucial issues that the real controversy was not fully tried. We conclude it did not.

B. Admissibility of the Claimed Improper Testimony

1. Postcommitment Annual Reviews

¶ 39. Sugden contends that references Dr. Hill made in her testimony to annual reviews performed pursuant to WIS. STAT. § 980.07 after commitment are irrelevant to the issues the jury was to decide and instead refer to the effect of the verdict, which is improper information to present to the jury. The State does not directly address relevancy, but responds that the two most significant references to annual reviews were invited error and therefore properly before the jury.

¶ 40. No published opinion has addressed the admissibility of evidence of postcommitment annual reviews in a WIS. STAT. ch. 980 commitment trial. In

650

*State v. Kaminski*, 2009 WI App 175, ¶¶ 22–24, 322 Wis. 2d 653, 777 N.W.2d 654, we decided that particular testimony on this topic did not prevent the real controversy from being tried in that case, but we did not decide whether it was admissible.

¶ 41. However, we find guidance in the case law holding that a jury should not be informed of the effect of its verdict. *See Delvaux v. Vanden Langenberg*, 130 Wis. 2d 464, 481–82, 387 N.W.2d 751 (1986) (legal effect of verdict is irrelevant to the jury's fact-finding function); *State v. Garnett*, 243 Wis. 615, 617–18, 11 N.W.2d 166 (1943) (where the prosecutor improperly told the jury of the minimum sentence, upon objection by the defense the court should have told jury the maximum sentence and then instructed the jury that the sentence is solely for the court to impose and jury must decide the case based on the evidence regardless of what punishment might be imposed); *State v. Wolff*, 171 Wis. 2d 161, 167, 491 N.W.2d 498 (Ct. App. 1992) (improper to refer to possible penalties in closing arguments to the jury).

¶ 42. Like a sentence and like the legal effect of a verdict, the postcommitment annual review is a legally determined consequence of the jury's verdict. Annual reviews are statutorily mandated for each person who has been committed under WIS. STAT. § 980.06. § 980.07(1). Commitment is required after a judge or jury has found that the evidence establishes beyond a reasonable doubt that the person meets the statutory requirements for a sexually violent person. *See* §§ 980.06; 980.05(3) and (5). Postcommitment annual reviews do not, generally, bear on the factual issues the jury must resolve in order to determine whether a person is a sexually violent person. We say "generally," because we cannot establish a blanket exclusion for all

testimony of annual reviews. Rather, the question of relevancy of such evidence needs to be examined in the particular context in which the evidence is offered.

¶ 43. Dr. Hill's first two references to annual reviews occurred on direct examination, when Dr. Hill was describing her job duties involving WIS. STAT. ch. 980. She stated at one point that she "perform[ed] Chapter 980 re-evaluations for men who've already been committed," and at another point that she started doing ch. 980 re-evaluations in 2002, noting that they "must be done annually."

¶ 44. We conclude these references to postcommitment annual reviews are not relevant. Dr. Hill's experience in evaluating persons to determine if they meet the statutory criteria for commitment is certainly relevant to her expertise, which is a necessary foundation for the admissibility of her opinions. *See* WIS. STAT. § 907.02 (expert testimony). Thus, for example, the number of evaluations she has done is relevant to her expertise. However, whether she performed the evaluations before commitment—to determine if a person should be committed—or after commitment—to determine if a person continues to meet the criteria—does not add in any way to her expertise. Nor does the fact that the postcommitment reviews are done annually add to her expertise. If Sugden had objected to the portion of this testimony informing the jury about postcommitment annual reviews, the circuit court should have excluded it.

¶ 45. Dr. Hill's third and fourth references to postcommitment annual reviews suggested to the jury the role these reviews play in determining the length of a person's commitment. In disagreeing with defense counsel's suggestion that changes in a person because of

age or health make risk predictions unreliable, Dr. Hill stated, "[b]ut, you see, in 15 years he would be re-evaluated every single year." She later indicated the annual re-evaluations were the means for evaluating the progress in treatment, which, in turn, was related to the length of commitment.

¶ 46. We agree with Sugden that whether he will be re-evaluated every year, at which times age and declining health and progress in treatment will be assessed, is irrelevant to any issue before the jury. The jury is to make a determination whether Sugden now meets the statutory criteria for commitment. Whether there is a method for re-evaluating him to take changed circumstances into account does not have a tendency to make any fact related to his present mental disorder or dangerousness more or less probable. *See* Wis. Stat. § 904.01 (defining relevance).

¶ 47. Instead of arguing relevancy, the State contends that the doctrine of invited error applies. *See State v. Robles*, 157 Wis. 2d 55, 60, 458 N.W.2d 818 (Ct. App. 1990), *aff'd sub nom. State v. Martin*, 162 Wis. 2d 883, 470 N.W.2d 900 (1991) ("If a defendant selects a course of action, that defendant will not be heard later to allege error or defects precipitated by such action. Such an election constitutes waiver or abandonment of the right to complain.") (citations omitted). The State contends that in the third instance Dr. Hill's response was an appropriate response to defense counsel's question and in the fourth instance the prosecutor's question regarding the length of commitment was proper given defense counsel's earlier reference to "potential . . . lifelong commitment." In essence, the State is arguing that Sugden has waived the right to object to irrelevant testimony on annual reviews because his

counsel's deficient questioning led to that testimony. However, reversal based on the real controversy not being fully tried does not require that errors be preserved. Thus, even if defense counsel's deficient questioning was responsible for Dr. Hill's irrelevant testimony on annual reviews—an issue we do not decide—that testimony is nonetheless evidence that we consider in deciding whether the real controversy was fully tried.

## 2. Postcommitment Treatment

¶ 48. Sugden cites two references by Dr. Hill to postcommitment treatment, which, he contends, were erroneously admitted. One occurred when the State, in the context of examining Dr. Hill about her experience, asked, "What's the commitment [under WIS. STAT. ch. 980] for?" She answered, "Commitment is for treatment." At a later point she explained that "commitment is until a person demonstrates progress in treatment" and "a person committed is required to be involved in treatment." Sugden also refers to the State's comments at the end of its initial and rebuttal closing arguments, which repeated Dr. Pierquet's testimony that ch. 980 gives high risk sex offenders "the opportunity for treatment."

¶ 49. In *Kaminski* we addressed testimony on postcommitment treatment in the context of an argument that the testimony, not objected to at trial, implicitly suggested that commitment was in the best interests of Kaminski and the community. *Kaminski*, 322 Wis. 2d 653, ¶ 25. In deciding this did not warrant reversal on the ground that the real controversy was not fully tried, we rejected an argument based on an analogy to proceedings involving termination of parental rights (TPR). *Id.*, ¶¶ 26–27. The argument was

that, as in a TPR proceeding, in a WIS. STAT. ch. 980 proceeding the best interests of the respondent should be considered separately from the fact-finding. *Id.* To the extent Sugden is asking us to revisit this argument, we decline to do so because we are bound by our ruling in *Kaminski. See Cook v. Cook*, 208 Wis. 2d 166, 189–90, 560 N.W.2d 246 (1997).

■ ■

¶ 50. However, we did not decide in *Kaminski* whether evidence on postcommitment treatment was relevant to the issues before a jury in a WIS. STAT. ch. 980 proceeding. We therefore address it here. We conclude that, similar to postcommitment annual reviews, the existence of treatment for committed persons is a consequence of commitment and, generally, is not relevant in determining whether a person is a sexually violent person. While the purpose of commitment is for "control, care and treatment until such time as the person is no longer a sexually violent person," § 980.06, the finding that someone is a sexually violent person does not involve consideration of whether the person needs or would benefit from treatment. *See* § 980.01(7). However, as with evidence of postcommitment annual reviews, each instance of proffered evidence on post-commitment treatment must be analyzed in context to determine if it is relevant.

■

¶ 51. We agree with Sugden that Dr. Hill's testimony that the purpose of WIS. STAT. ch. 980 is for treatment is not relevant. It does not bear on her credentials or expertise and we can identify no other fact of consequence that this evidence makes more or less probable. *See* § 904.01. The State does not offer a developed argument to the contrary.

¶ 52. The State contends that Dr. Pierquet's testimony on postcommitment treatment, referred to in the State's closing argument, was in response to defense counsel's question and was more extensive than the State's closing references and more extensive than Dr. Hill's testimony. Therefore, according to the State, the State is not responsible for having "clouded" any crucial issue.

¶ 53. The State's argument is based on a misunderstanding of the real-controversy-not-tried standard. This standard is not concerned with who is "at fault" for the unobjected-to, erroneously admitted evidence. Rather, it is concerned with the result: did that evidence prevent the real controversy from being fully tried? Thus, even if Dr. Pierquet's testimony on the "opportunity for treatment" was responsive to defense counsel's question—an issue we need not decide—it is evidence that should not have been permitted for purposes of our analysis here.

¶ 54. Accordingly, we conclude that Dr. Pierquet's testimony on postcommitment treatment, like Dr. Hill's testimony that the purpose of commitment is treatment, is irrelevant and should be considered in deciding whether the real controversy was fully tried. We discuss the State's references in closing argument in subsection C.

### 3. Screening Process

¶ 55. In summarizing her experience on direct examination, Dr. Hill testified that she currently performs "special purpose evaluations." In explaining the nature of these evaluations, Dr. Hill effectively informed the jury that only "a small number" of the total number of sex offenders facing release from prison are referred for a special purpose evaluation to determine

whether the prisoner meets the criteria for a Wis. Stat. ch. 980 commitment. Sugden contends that this information is irrelevant to establish Hill's credentials and irrelevant to the issue whether he is a sexually violent person. He relies on *Budd*, 306 Wis. 2d 167. The State responds that *Budd* is distinguishable and that this testimony is relevant to establish Dr. Hill's credentials.

¶ 56. We agree with Sugden that *Budd* is dispositive on the issue of relevancy. In *Budd* we addressed expert testimony on the screening process, which the circuit court had admitted over the respondent's objection. *Id.*, ¶ 3. That expert, presented by the State, testified that the chairman of the End of Confinement Review Board (ECRB) annually screens all sex offenders scheduled for release from Wisconsin state prisons and refers about 25% to the ECRB, which then refers about 50% of those cases to the special purpose evaluation unit, where that expert worked. *Id.*, ¶ 4. The expert testified that she and the other evaluators in her unit recommend about a third of those cases for Wis. Stat. ch. 980 commitment proceedings. *Id.* We determined that, without an explanation of why only 4.5% were chosen for a ch. 980 referral, this evidence was irrelevant to the issue of whether Budd was a sexually violent person. *Id.*, ¶ 16.

¶ 57. It is true, as the State contends, that in this case the expert's testimony on the screening process was not as elaborate as that in *Budd*, and the jury was not given a concrete, very low number, but the more general and ambiguous phrase, "a small number of them." However, our reasoning in *Budd* is nonetheless applicable. The proportion of about-to-be released sex offenders who are referred for a special purpose

evaluation—to determine whether they meet the requirements of Wis. Stat. ch. 980—is not, in itself, relevant to whether a particular person referred meets the requirements. This is true whether that proportion is expressed in terms of a specific percentage or a more general description of the relative size of the group.

¶ 58. We do not agree with the State that this testimony is relevant to establish Dr. Hill's credentials. Dr. Hill's experience in doing evaluations under Wis. Stat. ch. 980 is relevant to her expertise, but the existence of a screening process before a referral is made to her or the relative size of the group selected for evaluations is not.[9]

C. Effect of Inadmissible Testimony on Trial of Real Controversy

¶ 59. The crucial issues in this trial were whether Sugden had a qualifying mental illness and whether he was more likely than not to commit a future act of sexual violence because of that disorder. The defense did not dispute that Sugden had committed a sexually violent offense: there was detailed evidence from the victim and others on one of the rapes, and in closing argument defense counsel acknowledged that "Sugden was convicted of some terrible crimes 32 years ago, undisputed."

¶ 60. On the issue of a qualifying mental illness, the dispute between Dr. Hill, on the one hand, and Drs. Rosell and Pierquet, on the other, centered on their differing views over whether the details of the two violent rapes that Sugden committed in 1976 and his sexual treatment of his wife in that same time period satisfied the criteria for a mental disorder that predis-

---

[9] Because of this conclusion, we do not reach the parties' dispute over whether this testimony contains inadmissible hearsay.

poses him to commit acts of sexual violence.[10] The victim of the second rape, her friend who went to get help, and the police officer who came to the rescue testified, as did Sugden's ex-wife; and the jury heard accounts of the first rape. Sugden's son and sister testified on Sugden's behalf, stating that his ex-wife never told them she was sexually assaulted by Sugden. Thus, the jury had to evaluate the truth of Sugden's ex-wife's account in order to decide whether to accept Dr. Hill's opinion on a qualifying mental illness.

¶ 61. The experts also differed on how they viewed the evidence that Sugden had not sexually reoffended during his long period of incarceration and had over the last sixteen years in large part conformed to prison rules. Drs. Rosell and Pierquet viewed this as evidence Sugden could control his behavior, including his sexual behavior. This evidence thus contributed to their view that Sugden's personality disorder does not predispose him to acts of sexual violence. Dr. Hill, on the other hand, opined that paraphilia nonconsent and sadism do not remit over time and can result in violent sexual conduct given the opportunity.

¶ 62. These differences between the experts on diagnosis were thoroughly explored, with extensive testimony on the basis for the opinions of each.

¶ 63. As for the issue of future dangerousness, we have discussed above the testimony of Drs. Hill and Pierquet, who agreed the risk of sexual reoffending was

---

[10] Sugden's ex-wife testified that he would force her to have sex after slapping her around and on one occasion beat her up and held a knife to her neck, saying he was going to rape her. On that occasion, she testified, he admitted to the first of the rapes for which he was convicted and told her that if she didn't stop him, he would do it again.

more likely than not. Both witnesses were thoroughly examined on how they arrived at their respective opinions.

¶ 64. The jury also heard from the custodian of Sugden's DOC records, who described the circumstances of the attempted escape and hostage-taking in 1984, as well as numerous prison misconduct reports between 1977 and 1992. That witness, as well as two witnesses called by Sugden, testified to his improved behavior in prison over the last fourteen to sixteen years in terms of complying with prison rules and being a good worker. The jury also heard that Sugden consistently refused all recommended training and treatment, including sex offender treatment, and that he denied to Dr. Rosell that he had committed any sexual assaults. In summary, there was detailed information about Sugden's behavior in prison for the jury to take into account along with the experts' opinions on Sugden's risk of reoffending.

¶ 65. In the context of this extensive testimony properly focused on the issues in controversy, we consider the evidence that should not have been admitted. We begin with the testimony on postcommitment annual reviews. Sugden asserts that the prejudice arising from telling the jury about postcommitment annual reviews is that it may lead jurors to believe that, if they make a mistake in returning a verdict that results in commitment, the error can be corrected through annual reviews. According to Sugden, this may make jurors decide he is a sexually violent person even if they have a reasonable doubt.

¶ 66. We do not believe this testimony would have made a reasonable juror likely to take less seriously his or her responsibility to decide whether the State had proved beyond a reasonable doubt that Sugden is a

sexually violent person as defined in the instructions and based on the evidence. First, immediately after Dr. Hill's statement that Sugden would be re-evaluated every year after commitment, defense counsel elicited her agreement that the issue of evaluations after commitment was not before the jury; and he refocused her attention—and the jury's attention—on the issues the jury was to decide. Second, there was no connection drawn for the jurors, even implicitly, between the availability of postcommitment annual reviews and the significance of the jurors' decision. This distinguishes this case from the two cases of other jurisdictions on which Sugden relies: *Johnson v. State*, 601 A.2d 1093, 1096–97 (Md. 1992) (prosecutor's comments on defendant's right of appeal are improper because, besides not being based on the evidence, they implied that the jury need not be unduly concerned about convicting the defendant and encouraged the jury to disregard the instructions); and *People v. Rutledge*, 578 N.Y.S.2d 162, 163 (1992), *accord Kaminski*, 322 Wis. 2d 653, ¶ 22.[11]

¶ 67. Next we address the evidence on postcommitment treatment and the State's comments on that topic in closing argument. In this case, as in *Kaminski*, 322 Wis. 2d 653, ¶ 23, and likely most Wis. Stat. ch. 980 proceedings, there was evidence concerning precommitment treatment. The jurors here heard that treatment can reduce the risk of reoffending and that sex offender treatment was regularly offered Sugden in prison but he declined to participate. Our analysis in *Kaminski*

[11] In *State v. Kaminski*, 2009 WI App 175, ¶ 22, 322 Wis. 2d 653, 777 N.W.2d 654, we concluded that the testimony in that case on postcommitment annual reviews would not lead a reasonable juror to conclude that the reviews could correct any mistake in their verdict and thereby relieve them of their obligation to make a decision based on the law and evidence.

applies here: without any specific reference to postcommitment treatment, a jury could reasonably infer from the evidence properly before it that Sugden would be offered treatment if he were committed. *Id.*

¶ 68. Testimony on postcommitment treatment could be prejudicial, potentially clouding the real issues in controversy, if presented in a way that invited the jury to focus on the need for treatment rather than on the requirements for commitment as instructed. However, we are satisfied that did not occur here. The brief reference by Dr. Hill to treatment as the purpose of commitment and the somewhat more extended comments on the same topic by Dr. Pierquet did not suggest that the jury should overlook the statutory requirements for commitment. Indeed, Dr. Pierquet's comments, in the context of her other testimony, demonstrate the importance in her view of strictly adhering to the statutory standard.

¶ 69. As for the State's final sentences in initial closing argument and rebuttal, we view these in the context of the rest of the State's argument. The State's argument properly focused on the elements it needed to prove to establish that Sugden was a sexually violent person and the evidence supporting those elements. While the references to the "opportunity for treatment" should not have been made, we conclude they cannot reasonably be viewed as a suggestion to the jury that they disregard the instructions defining a sexually violent person and the evidence related to these criteria.[12]

---

[12] We recognize that, because there was no objection to evidence on postcommitment treatment, the prosecutor's reference to it in closing argument was not an instance of asking the jury to arrive at a verdict by considering factors other than the

¶ 70. We turn to Dr. Hill's testimony that "a small number" of sex offenders released from prison are referred, after a review, for a special purpose evaluation. The harm in this type of testimony is that it could potentially convey that a person must be or probably is a sexually violent person because only a small number of sex offenders are even referred for a special Wis. Stat. ch. 980 evaluation. However, we conclude that this single reference in this case was not sufficient to deflect the jury's attention from a proper focus on the instructions defining a sexually violent person and the evidence relevant to that definition.

¶ 71. We do not agree with Sugden that *Budd* requires a different outcome. In *Budd*, after concluding the testimony on the screening process, which had been objected to, was irrelevant, we concluded its admission was not harmless error. *Budd*, 306 Wis. 2d 167, ¶ 18. The percentages testified to in *Budd*—working out to 4.5%—vividly demonstrated how very small the number of referrals were, and the prosecutor reiterated this testimony in his closing argument. *Id.*, ¶ 4. In addition, this testimony was referenced in closing argument. *Id.*, ¶ 18. Given these facts, and the fact that three out of four experts opined that Budd was not a sexually violent person, we concluded that the inadmissible testimony contributed to the jury's finding that Budd was a sexually violent person. *Id.*

¶ 72. In contrast, in this case the "small number" description was more understated than the percentages and there was no repetition or attention focused on it. In addition, the framework of our analysis is

evidence. That sort of request would have been improper. *See State v. Draize*, 88 Wis. 2d 445, 454, 276 N.W.2d 784 (1979).

different than that in *Budd*. We are not inquiring in this case, as we did in *Budd*, whether the State has successfully demonstrated that a preserved trial court error is harmless. *See id.*, ¶ 17; *see also State v. Dyess*, 124 Wis. 2d 525, 543, 370 N.W.2d 222 (1985) (beneficiary of the error has the burden of proving the error is harmless). Rather, the inquiry here is whether the defendant has persuaded us that this is one of the exceptional cases in which we should use our discretionary power of reversal because inadmissible evidence, not objected to, prevented the real controversy from being fully tried. In this analysis, we look at the evidence properly presented to the jury and the arguments of counsel to determine whether the inadmissible evidence was sufficient to distract the jury from its task of deciding if Sugden was a sexually violent person according to the instructions and the admissible evidence. We have concluded that the evidence on the screening process did not have this effect, and *Budd* does not require a different result.

¶ 73. Having decided that none of the categories of inadmissible testimony prevented the real controversy from being fully tried, we consider whether there is a different result when we view all the categories together. We conclude there is not. In no category did the effect of the inadmissible evidence present a close question as to whether it was significant enough to prevent the real controversy from being fully tried. Viewing the categories of inadmissible evidence in combination, we are satisfied that they did not distract the jury from its task of considering, in light of the court's instructions, the extensive evidence on the crucial issues of a qualifying mental disorder and the likelihood of future reoffending.[13]

[13] Sugden requests that, even if we decide he is not entitled

## CONCLUSION

¶ 74. We conclude the circuit court properly denied Sugden's motion for a new trial based on newly discovered evidence and properly excluded the statement on supervision in Dr. Pierquet's report. For the reasons explained above, we decline to exercise our discretionary power of reversal. Accordingly, we affirm the judgment of commitment and the order denying the postcommitment motion.

*By the Court.*—Judgment and order affirmed.

to a new trial based on the newly discovered evidence standard, we consider the new Static-99 percentages in deciding whether to exercise our discretionary powers of reversal. We have already decided that the new risk percentages do not warrant a new trial because there is no reasonable probability that this new evidence will raise a reasonable doubt that Sugden meets the standard for commitment as a sexually violent person. We conclude the absence of these new risk percentages did not, either alone or in combination with the testimony we have discussed in section III.C, prevent the real controversy from being fully tried.