FISCHER, Plaintiff in error, vs. THE STATE, Defendant in error.

*November 12—December 7, 1937.*

· The cause was submitted for the plaintiff in error on the brief of *L. D. Potter,* attorney, and *Wm. H. Smith* of counsel, both of Racine, and for the defendant in error on that of *John P. McEvoy,* district attorney of Kenosha county, *K. T. Savage,* assistant district attorney, the *Attorney General,* and *J. E. Messerschmidt,* assistant attorney general.

NELSON, J. On June 11, 1934, one Anthony Broski operated a grocery store and meat market in the village of Somers in Kenosha county. At about 9:25 p. m. on that

day both he and his wife were in the store. They were about to close it up for the night. Mr. Broski was behind the meat-service counter, which was located at the rear of the store. At about that time a man walked into the store and asked for a package of Chesterfield cigarettes. Mrs. Broski procured the requested cigarettes for him and was paid the price thereof. Shortly thereafter the man exhibited a gun and commanded both Mr. and Mrs. Broski to put up their hands, stating that it was a holdup. The man then ordered Mrs. Broski to go back of the service counter, commanded Mr. Broski to move over to where she was and to face the wall, and said: "I want the wallet out of your back pocket." Shortly thereafter the man fired a shot at the floor. The bullet lodged in the floor a short distance from where Mrs. Broski stood. Mr. Broski screamed, "Oh! my God." Immediately thereafter the man shot Mr. Broski. The bullet entered Broski's left and upper abdomen, passed through his stomach, liver, pancreas, and left kidney, and lodged just behind the skin of his back. Immediately after the second shot, Mrs. Broski turned on the man and said: "You dirty rat." The man then ran through the front door of the store, which was open. He pulled the door shut and slammed it on Mrs. Broski's wrist. She opened the door, and the man for a short time turned on her with the gun and then ran across the street to an automobile which was parked on the opposite side of the street and in which another man was sitting at the wheel. Mrs. Broski ran toward the car, screaming for help. She tried to get the license number, but, because of her excitement and a warning given by her husband, who had followed her into the street, she was able to obtain only the first three numbers and one additional number of a license plate containing six numbers. The holdup men escaped. Shortly thereafter Mr. Broski was rushed to a hospital in Kenosha county, where he died the following

day. Apparently the descriptions of the murderer and his companion, or the description of the automobile in which they made their getaway, proved of no value in solving the crime. In September thereafter, Mrs. Broski was taken to the Summerdale police station in Chicago by a police officer of the city of Kenosha and a deputy sheriff of Kenosha county to witness a "show-up" of men who were there held in custody. At that time she identified one Edwin Brethauer as the man who had killed her husband and one George Hirschmann as the one who drove the automobile in which the murderer escaped. Upon her identifying those men, the Kenosha police officer called the Kenosha police department, and thereafter Sheriff Erickson of Kenosha county swore to complaints charging Brethauer and Hirschmann with the murder of Broski. Warrants were duly issued, but for some reason which does not clearly appear, they were not served. During the month of February, 1935, the defendant was arrested for the murder of one Schenning, a police officer, a separate and distinct offense, committed in Racine county on the 8th of February, 1935, and was thereafter confined in the county jail of that county. Mrs. Broski was called to that jail to witness a "show-up" of certain prisoners which included the defendant. After witnessing two "show-ups," Mrs. Broski identified the defendant as the murderer of her husband. His arrest for the murder of Broski followed. A preliminary examination was held and he was bound over to the circuit court for trial. At the trial thereafter had in the circuit court for Kenosha county the jury returned a verdict of guilty of murder in the first degree. Other material facts will be recited as the several assignments of error are discussed.

The defendant earnestly contends that the trial court erred in refusing to grant his motion for a new trial: (1) Because the evidence adduced upon the trial was insufficient

to prove him guilty beyond a reasonable doubt; (2) because the trial court erred in receiving certain evidence; (3) because of certain prejudicial remarks made by the district attorney in his closing argument to the jury; (4) because two members of the jury were close friends of the members of the Schenning family; and (5) because justice has not been done.

The first contention is based upon the assertion that Mrs. Broski's testimony which related to the identification of the defendant as the murderer of her husband was so completely impeached as to render such testimony incredible. We have carefully read the transcript of her testimony, and while we have noted a number of material discrepancies between her testimony given at the trial and that given at the preliminary examination, and while her testimony describing with such minuteness the suit of clothes which the murderer of her husband had on at the time of the murder, exactly described a suit of clothes which the defendant concededly owned at the time she identified him in the jail in February, 1935, and which she had no doubt closely examined before the trial, might give rise in some minds to a doubt as to the truthfulness of her testimony, we are nevertheless of the opinion that the credibility of her testimony relating to the identification of the defendant was for the jury. *State v. Hintz,* 200 Wis. 636, 229 N. W. 54; *State v. Fricke,* 215 Wis. 661, 255 N. W. 724; *Parke v. State,* 204 Wis. 443, 235 N. W. 775, and numerous cases cited therein.

The defendant did not take the stand. The defendant's defense was an alibi. At the time of the murder of Broski, the defendant resided with his wife and children at Burlington, Racine county. Three witnesses, including the wife of the defendant, gave testimony tending to show that at about 1 o'clock p. m., on June 11, 1934, the defendant, in company with Mrs. Fischer and Mr. and Mrs. Taylor of Fond du

Lac, left Burlington and drove to Fond du Lac, where they spent the night, returning to Burlington the following day. Another witness, a Mr. Litscher, who resided at Campbellsport, Wisconsin, testified that Mr. and Mrs. Taylor and the defendant and his wife were at his tavern on the evening of June 11th, and that they did not leave his place of business until after dark. The credibility of the alibi witnesses was, in our opinion, likewise a question for the jury.

The defendant's second, third, and fourth assignments of error will be considered together because they are so closely connected as to warrant such treatment.

From the cross-examination of Mr. Taylor and Mrs. Fischer, we conclude that a police officer, "Pinkey" Schenning, was killed and murdered in Racine county in February, 1935, and that the defendant had pleaded guilty to a charge of murder in the second degree as a result of his connection with that crime. The district attorney concluded his cross-examination of the witness Taylor, as follows:

"Q. You are very much convinced of the innocence of Fischer, aren't you? A. Positively.

"Q. On the occasion he was arrested in Racine for another offense you were very sure then? A. I didn't believe it was possible. For Fischer to do a thing he did.

"Q. And you repeatedly said so? A. Absolutely.

"Q. You repeatedly said there was no reason why he should have committed a crime? A. I paid him from June until the 1st of February $1,350 and I could see no reason why he was accompanying a man who did this thing.

"Q. You didn't believe his guilt until he told you so himself? A. No."

This cross-examination, though not objected to, went beyond the limits of a proper cross-examination, presumably conducted for the purpose of testing the bias or interest of Taylor. Taylor's belief as to the guilt or innocence of the defendant, as well as evidence tending to prove that the

defendant had subsequently committed another and separate crime, were quite irrelevant. If it stood alone we would probably hold that it was not so prejudicial as to amount to reversible error.

But, in concluding the cross-examination of Mrs. Fischer, the wife of the defendant, the following questions were asked and their answers compelled by the court notwithstanding defendant's objections:

"*Q*. Do you recall the date of your husband's arrest? In Burlington?

"Mr. Potter (interrupting) : If the court please, I would like to have on what charge (then to the district attorney) : This charge you mean?

"Mr. McEvoy: No, *on the charge of the murder of one Officer Schenning.*

"Mr. Potter : I object to the question as not competent in this hearing and it has no bearing.

"Mr. McEvoy: I think I can make it competent because the witness made some statements then and I think I have a right to show what statements she made concerning that to show her interest and to test the credibility of the witness."

(Counsel and the Court confer at the judge's bench.)

"Mr. McEvoy: I wish to question Mrs. Fischer concerning statements to the authorities of Racine county concerning her husband's whereabouts on the night of the murder of Officer Schenning. The purpose is to show the interest of this witness and test her credibility to show she had made false statements in connection with another matter and, I think, has a direct bearing on her credibility in this case.

"Mr. Potter : I object on the ground that is not at all relevant in this case. The two charges are entirely separate and months apart. She was not questioned about this at that time and it has no bearing whatsoever. I see no reason why we can go in and bring in something that has no connection whatsoever. It only adds to prejudice and does not show—

"Court (interrupting Mr. Potter) : I think it is competent for the purpose stated by the district attorney and, knowing what it is to be, I say to the jury, as the district

attorney has stated, that the purpose of the questions he is about to ask is only to test the credibility and bearing on the credibility of this witness, and has no bearing whatever on the charge being tried here against this defendant.

"Mr. Potter : We wish to note our exceptions to this kind of testimony."

(Cross-examination resumed by Mr. McEvoy.)

"*Q.* Do you recall the date when your husband was arrested in Racine county *for the murder of Officer Schenning? A.* The 7th or 8th of February.

"*Q.* Do you remember being questioned by Officer Ed Piel and Louis Zila of the sheriff's department concerning that night,—his whereabouts the evening *of the killing of Officer Schenning? A.* Yes.

"*Q.* You told those officers, didn't you, that your husband came home about supper time that night? *A.* I did.

"*Q.* And you told them you remembered the time because shortly after he got in the house the fire whistle blew, or a whistle out there, and you glanced at the clock and set it? *A.* No, sir.

"*Q.* But you did tell them he came home about supper time? *A.* I did.

"*Q.* And didn't you tell them he never left home after that? *A.* I did.

"*Q.* And that he was with you all of the time. *A.* Yes, sir.

"*Q.* They questioned you as to whether he had gone out in his car that evening, didn't they? *A.* Yes.

"*Q.* And you told them he never left home? *A.* I did.

"*Q.* And that was false, wasn't it? *A.* Yes, sir.

"Mr. McEvoy : That is all."

Redirect examination—

Examined by Mr. Potter :

"*Q.* Did your husband, for a short time that evening leave the home? *A.* No, sir.

"*Q.* He never left after he came home? *A.* No, sir.

"Mr. Potter : That is all."

Recross-examination—

Examined by Mr. McEvoy :

"*Q.* What time did he come home? *A.* When?

"Q. That night *of the killing of Officer Schenning?*
A. He came home twenty-five minutes to nine.

"Q. And he told you to tell the officers, or anyone else who might ask you, that he came home at six o'clock, didn't he?  A. He did not.

"Q. Why did you tell them that then?  A. I told them that of my own accord.

"Q. Why did you do that?  Can you give us any explanation why you told that falsehood?  A. No.

"Q. Did your husband say anything to you at all when he came that night at twenty-five minutes to nine?  A. No.

"Q. Did he tell you about where he had been?  A. Yes.

"Q. What did he tell you?  A. He told me what had happened.

"Q. He told you he was involved in a holdup and murder?  A. Yes.

"Q. He burned some clothing in the furnace that night, didn't he?  A. I don't know.

"Q. When he told you that did you believe he might likely be questioned about it?  A. I didn't know.

"Q. Is that the reason why when the officers asked you about where he had been that night you told a falsehood and told them he came home at six o'clock,—isn't that the reason?  A. I don't know.

"Q. Isn't that the truth?  A. You mean isn't it the truth I told them—

"Q. (interrupting) No, isn't it because your husband, Leonard Fischer, told you about the trouble he was in that caused you to tell the officers these lies when they questioned you?  A. Yes.

"Q. You told those lies because you wanted to protect your husband, isn't that it?  A. I did."

This cross-examination, in our opinion, went way beyond the permissible limits of a proper cross-examination conducted for the asserted purpose of testing the credibility, bias, and interest of Mrs. Fischer. It related in large part to a matter which was wholly collateral and irrelevant, having no tendency to prove that the defendant was guilty of the

crime for which he was being tried. It also sought and elicited information of a confidential character, which clearly was privileged. Sec. 325.18, Stats. 1935. It deliberately sought to elicit, and did elicit, proof tending to show that the defendant was guilty of the murder of Officer Schenning, a separate and distinct crime in which the defendant had participated, about eight months after the crime was committed for which he was being tried. It is the settled law of this state that, upon the trial of a defendant charged with a certain crime, the evidence must be confined to the offense charged, and neither general bad character nor commission of other specific disconnected acts, whether criminal or merely meretricious, are provable against him. *Paulson v. State,* 118 Wis. 89, 94 N. W. 771. As a general rule, the receipt of such evidence is prejudicial. *Topolewski v. State,* 130 Wis. 244, 109 N. W. 1037. There are, of course, exceptions to the general rule. *State v. Miller,* 47 Wis. 530, 3 N. W. 31; *Esterra v. State,* 196 Wis. 104, 219 N. W. 349; *State v. Meating,* 202 Wis. 47, 231 N. W. 263; *State v. Jackson,* 219 Wis. 13, 261 N. W. 732. None of our cases justified the receipt of evidence in this case tending to prove that the defendant had committed or was guilty of another crime having no connection with the crime charged. The receipt of evidence tending to show that the defendant was guilty of participating in the murder of Officer Schenning was clearly error and very prejudicial. This appears the more clearly when certain remarks made by the district attorney in his closing argument to the jury are considered. In order that the prejudicial effect of such remarks may be fully understood, it will be necessary to advert to certain evidence given by two witnesses for the state, called to rebut the testimony of the defendant's alibi witnesses. On the 11th of June, 1934, one Burt operated a tavern about four

and one-half miles distant from the Broski store. About a half hour or so before Broski was held up the Burt tavern was also held up. At the time of that holdup Mr. Burt and a customer by the name of Charles Schiller were present in the tavern. Schiller was produced as a witness and gave testimony tending to show that the defendant was the person who held up the Burt place. Burt testified that in his opinion the defendant was the man who held up his tavern. It appeared that on at least two occasions after June 11th the defendant was in Burt's tavern and solicited Burt to become a member of a tavern keepers' association, which the defendant was helping to organize. At neither interview did it occur to Burt that the defendant looked like the man who had held up his place on June 11th. In his closing argument to the jury it is asserted by the defendant that the district attorney said:

"Counsel for defendant contends that had Burt identified the defendant, when the defendant was in his place after the robbery in Burt's place, that the defendant would have been in position to produce evidence showing that the defendant was not at the scene of the crime on the night it was committed. The state's answer is that it is too bad Burt did not recognize the defendant for had he recognized him, *the defendant would not have left a trail of blood in two counties; and that that brave and courageous officer, Pinkey Schenning, would still be living.*"

The defendant's attorney objected to the remarks, and moved that that part of the argument be stricken and the jury instructed to disregard it. Whereupon the district attorney continued:

"True, he didn't, but he was with Reinhold Fleuker who did. He was a pal of Reinhold Fleuker."

The court thereupon simply said:

"Motion is granted and the jury is so instructed."

The transcript of the reporter shows only the following note:

"During the closing argument of Mr. McEvoy, Mr. Potter interposes an objection as to that part of Mr. McEvoy's argument relating to Officer Schenning, the killing of Officer Schenning and a 'blood trail across two counties.'"

The reporter apparently made the record after the incident had occurred. In the state's brief, which was prepared by the district attorney, is the following admission:

"We have no definite recollection as to the exact language used, nor as to the name of Reinhold Fleuker being mentioned as claimed by counsel; therefore, we can neither deny nor affirm its making. That the remark concerning the shooting of Officer Schenning was unfortunately made, affirmatively appears by the record."

Considering the cross-examinations hereinbefore recited at length, and the further fact that two friends of the Schenning family were members of the jury, the remark cannot be passed as merely an unfortunate remark. It tends to corroborate the defendant's contention that the murder of Officer Schenning was deliberately dragged into the case for the purpose of prejudicing the defendant, and not for the good-faith purpose of testing the credibility, bias, or interest of Mrs. Fischer. The remarks of the district attorney were most surely calculated to arouse the prejudice and passion of the jury and were clearly prejudicial. Simply granting the defendant's motion to strike the remarks of the district attorney and instructing the jury to disregard them could not possibly cure the prejudicial effect thereof. Because of the prejudicial cross-examinations and the remarks of the district attorney we conclude that the defendant did not have a fair trial. In *Paulson v. State, supra,* it was said (p. 98):

"From the time when advancing civilization began to recognize that the purpose and end of a criminal trial is as much

to discharge the innocent accused as to punish the guilty, it has been held that evidence against him should be confined to the very offense charged, and that neither general bad character nor commission of other specific disconnected acts, whether criminal or merely meretricious, could be proved against him.' This was predicated on the fundamental principle of justice that the bad man no more than the good ought to be convicted of a crime not committed by him."

While it may well be that the defendant is guilty of the offense charged against him, he is nevertheless entitled to a fair trial according to the established rules of procedure and the settled principles of law. *Boldt v. State,* 72 Wis. 7, 17, 38 N. W. 177.

*By the Court.*—The judgment of the circuit court is reversed, and the cause remanded with directions to grant the plaintiff in error a new trial.