# COURT OF APPEALS
## DECISION
## DATED AND FILED

## February 26, 2021

**Sheila T. Reiff**
**Clerk of Court of Appeals**

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2020AP277**

**STATE OF WISCONSIN**

Cir. Ct. No. 2018TP6

**IN COURT OF APPEALS**
**DISTRICT III**

IN RE THE TERMINATION OF PARENTAL RIGHTS TO S. K.,
A PERSON UNDER THE AGE OF 18:

S. K.,

PETITIONER-RESPONDENT,

V.

S. S.,

RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Oconto County: MICHAEL T. JUDGE, Judge. *Affirmed*.

¶1 HRUZ, J.[1] Susan appeals an order terminating her parental rights to her daughter Dawn, as well as an order denying her postdisposition motion.[2] She argues that her trial attorney was ineffective by failing to object to, or moving to strike, certain testimony that was elicited during the trial in the grounds phase, and then by failing to move for a mistrial based on the admission of that evidence. The evidence at issue generally involves four areas of trial testimony regarding: (1) Susan having had three other children who were then in foster care; (2) Dawn not referring to Susan as "mom" or "mommy," but instead referring to her stepmother by those terms; (3) a particular incident involving Susan's conduct regarding one of her other children; and (4) Dawn never telling her stepsister that she "missed" Susan or that she wanted to go to Susan's house. Susan contends that all of this evidence was irrelevant and constituted improper "other acts" evidence. Susan also argues she is entitled to a new trial in the interests of justice. We reject these arguments and affirm.

## BACKGROUND

¶2 Dawn was born on July 24, 2010. She is the biological daughter of Susan and Paul, who at all times were unmarried to each other. Dawn lived

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

Cases appealed under WIS. STAT. RULE 809.107 "shall be given preference and shall be taken in an order that ensures that a decision is issued within 30 days after the filing of the appellant's reply …." See RULE 809.107(6)(e). Conflicts in this court's calendar have resulted in a delay. It is therefore necessary for this court to sua sponte extend the deadline for a decision in this case. See WIS. STAT. RULE 809.82(2)(a); **Rhonda R.D. v. Franklin R.D.**, 191 Wis. 2d 680, 694, 530 N.W.2d 34 (Ct. App. 1995). Accordingly, we extend our deadline to the date this decision is issued.

[2] For ease of reading and to protect confidentiality, we use pseudonyms when referring to S.S., her daughter S.K., the petitioner, and the petitioner's wife.

together with her parents until April 2013. From April to July 2013, Dawn lived only with Susan. Beginning in July 2013, Dawn lived mostly with Paul, who obtained primary placement of Dawn in late August 2013. Since December of 2015, Dawn has resided solely with Paul and his wife, Peggy. During some of that period Susan was incarcerated.

¶3 On December 21, 2018, Paul filed a petition to terminate Susan's parental rights to Dawn. He alleged as grounds Susan's abandonment of Dawn and her failure to assume parental responsibility, pursuant to WIS. STAT. § 48.415(1)(a) and (6), respectively. Both grounds relied on allegations regarding Susan's failure to have any contact with Dawn (or Paul) since December 25, 2015.

¶4 A one-day jury trial in the grounds phase was held on July 18, 2019. In general, Dawn's guardian ad litem ("GAL") and Paul presented evidence that focused on Susan's lack of any involvement with Dawn for years, including in Dawn's schooling, medical care and extracurricular activities, and the lack of any good cause for her absence. Susan's defense, while acknowledging large portions of her absence, emphasized her struggles with homelessness, an abusive relationship, and her mental health issues, as well as her testimony alleging that she was denied opportunities to speak with Dawn. The jury determined that Susan had both abandoned Dawn and failed to assume parental responsibility for her.

¶5 The matter proceeded to an evidentiary, dispositional hearing on September 11, 2019, before which the GAL filed a preliminary report and recommendation. The GAL concluded, based on her evaluation of the factors in WIS. STAT. § 48.426(3), that terminating Susan's parental rights was strongly supported by the facts and was in Dawn's best interests. After the hearing, the

circuit court determined it was in Dawn's best interests to terminate Susan's parental rights and entered a corresponding dispositional order.

¶6     Susan eventually filed a notice of intent to pursue postdisposition relief and a motion for new trial.  The motion argued that Susan was entitled to a new trial because she received constitutionally ineffective assistance from her trial counsel when he "failed to object, move to strike, or move for a mistrial due to irrelevant, and improper 'other acts' evidence introduced by the petitioner."

¶7     The allegedly improper evidence, all testimonial in nature, consisted of four exchanges.  First, Susan complained of her own unobjected-to testimony, made in response to questions by Paul's counsel on direct examination, that she had three other children who had been removed from her home and placed in foster care.  She points to the following portion of her examination:

> Q:  How many children do you have in total?
>
> A:  Four.
>
> Q:  How many of those children live with you on a full-time basis?
>
> A:  Right now they're in foster care until I am able to find housing.
>
> Q:  So you have [Dawn], and then there are three other children?
>
> A:  Yes.
>
> Q:  And is it correct that the three other children were taken away and put in foster care about three, three-and-a half years ago now?
>
> A:  No.  About almost three years, and yes, it was 'cause I was put in jail.
>
> Q:  Almost three years?
>
> A:  Yes.

4

Q: All right. And the conditions to get those children back include getting reasonable housing; is that correct?

A: Yes.

Q: Are there other conditions?

A: Complete a parenting class which I did. Psychological evaluation which I did. AODA which I did.

Q: Are there any conditions that you need to satisfy other than housing?

A: No.

Q: Okay. So you're about in the same shoes—same situation as you were a year ago then; is that right?

A: Yeah. When I was sick, yes.

¶8      Second, Susan faulted her counsel for not objecting to Paul's testimony that Dawn referred to Peggy, rather than Susan, as her mother. In this regard, Susan points to the following portion of Paul's testimony, offered on direct examination by his counsel:

Q: How does [Dawn] refer to [Susan] these days?

A: She calls her [Susan].

Q: Did she used to call her mom or mommy?

A: It used to be mommy.

Q: How long ago was it that she'd call her mommy?

A: Oh, man. I would say three, four years ago maybe.

Q: Did you do or say anything to encourage this child not to call her biological mother mommy?

A: No.

Q: Well, how did it come about that she started calling her [Susan]?

A: I guess it's just the love and affection that she's getting at home. You know, my wife was there for her. So—

5

Q: Did you witness [Peggy], your wife, say or do anything to this child to cause this child to stop calling [Susan] mommy?

A: No, no.

Q: What does [Dawn] call [Peggy]?

A: Mom.

Q: How long has she called her mom?

A: Like I said, three, maybe three years or so.

Q: Was there any particular incident you came across that prompted this child to call [Peggy] mom?

A: No.

Q: Did you ask the child to call [Peggy] mom?

A: Nope.

Q: Did [Peggy]?

A: She used to call her [Peggy], and just by herself she just started calling her mommy one day, and it's to this day. So like I said, I don't remember exactly when.

¶9     Third, Susan argues her counsel was deficient by not seeking relief regarding Paul's testimony, made upon examination by the GAL, about an incident involving one of Susan's other children. Paul testified:

Q: Okay. Now, the other question I want to ask you is [Susan] has testified that you were putting up impediments to her, blocking her from seeing [Dawn]. Did you ever help [Susan] with her own personal situation?

A: Yes.

Q: Can you tell us about that?

A: Okay. I don't remember the exact date. She and her boyfriend were getting in a fight, and she came over. I don't remember. I think … her youngest one. She brought him over with like a car carrier, knocking on my door, and she was crying. She asked me to take her child, if I could take her child. I says, well, what am I going to do, you

6

know, and she walked away. And she left me with the child, not my child mark ya. Didn't have no diapers, no formula.

So I had to run out to the store and get the child you know, the diapers and formula. I had that child over night, and I tried getting ahold of her the next day. I still didn't get ahold of her till maybe 1:00 in the afternoon. She finally called me back hollering at me and said she was on her way to come get her kid, and that was it.

Q: Thank you.

A: So I watched her kid that whole night. Child, excuse me.

¶10 The fourth, and final, allegedly improper testimony came from Paul's stepdaughter, and it concerned what Dawn allegedly said to her about not wanting to go to Susan's home and not "missing" Susan. In particular, Susan points to the following testimony from the stepdaughter on direct examination by Paul's counsel:

Q: Okay. Did you have an opportunity to observe [Dawn] after being returned from her mother before December of 2015?

A: Yes.

Q: What kind of observations did you have?

A: She often came home dirty, smelling of like cigarette smoke. A lot of times she wouldn't have the same clothes on that she left with. She would just be excited to be there because we tended to play a lot. So she'd get in the house. She'd usually take a bath right away, change her clothes, and then we'd start playing.

Q: Did you have an opportunity during that time period back then to observe [Dawn] before she was going to go to her mother's house?

A: Yes.

Q: Any observations that you had that you can report for us?

A: A lot of the same stuff. She would be in some of just work clothes kind of thing, just not very fancy clothes because we knew we wouldn't get them back or she tended to not come back with them. A lot of times she would just say she didn't want to go there. It was boring. She had nothing to do, nobody to play with.

….

Q: Have you ever heard [Dawn] talk about her mother, [Susan]?

A: A few times, yes.

Q: Well, has she ever indicated that she wants to go over to [Susan's] house?

A: No.

Q: Has the child ever indicated that she misses her mother?

A: No.

¶11     The circuit court held an evidentiary hearing on Susan's motion for a new trial, at which Susan's trial counsel was the only witness. Following the hearing, the court entered a written order denying the motion. The court concluded that the alleged errors by counsel were harmless and not prejudicial. In particular, the court noted the uncontested evidence that Susan

> was completely absent from [Dawn]'s life from Christmas 2015 through November 8, 2017, which is a twenty-two month period during which she failed to assume responsibility. The Respondent was sometimes but not continuously incarcerated between December 25, 2015 and November 8, 2017. The Respondent testified that she knew where [Dawn] attended school but did not communicate with the school and the last time she attended a parent-teacher conference was in 2015 and the last time she communicated with one of [Dawn]'s teachers was in 2015, even though she was on the mailing list, which advised of upcoming parent-teacher conferences.

Beyond the foregoing and other evidence regarding Susan's lack of involvement in Dawn's schooling, the court also noted Susan's testimony that she never helped with Dawn's doctor or dental visits, nor did she provide a gift or otherwise celebrate Dawn's birthdays. Accordingly, it concluded that Susan's ineffective assistance of counsel claim failed based upon lack of prejudice. Susan now appeals.

## DISCUSSION[3]

### I. *Ineffective Assistance of Counsel*

¶12    A parent in a termination of parental rights (TPR) action has a right to the effective assistance of counsel. *Oneida Cnty. Dep't of Soc. Servs. v. Nicole W.*, 2007 WI 30, ¶33, 299 Wis. 2d 637, 728 N.W.2d 652. To prove ineffective assistance of counsel, a parent must show both that his or her counsel's performance was deficient and that the deficient performance prejudiced the parent. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also A.S. v. State*, 168 Wis. 2d 995, 1005, 485 N.W.2d 52 (1992) (holding that the criminal *Strickland* test for ineffective assistance also applies to involuntary TPR proceedings).

¶13    To establish deficient performance, a parent must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *See Strickland*, 466 U.S. at 687. To establish prejudice, a parent must show there is a reasonable probability that the result of the proceeding would have been different absent counsel's

---

[3] We note that the GAL filed a notice with this court stating she would not be filing an appellate brief and noting, in part, that she is "unequivocally aligned with [Paul]."

deficient performance. *See id.* at 694. If the parent fails to prove either deficient performance or prejudice, we need not address whether the other prong was satisfied. *See id.* at 697.

¶14　An ineffective assistance of counsel claim presents a mixed question of fact and law. *State v. Pitsch*, 124 Wis. 2d 628, 633-34, 369 N.W.2d 711 (1985). We will uphold the circuit court's factual findings unless they are clearly erroneous. *Id.* at 634. However, whether those facts fulfill the legal standard for ineffective assistance is a question of law that we review independently. *Id.*

¶15　Again, Susan argues that her trial attorney rendered ineffective assistance by failing to object to, or moving to strike, certain testimony that was elicited during the trial in the grounds phase, and then by failing to move for a mistrial based on the admission of that evidence. In particular, she contends that each of these lines of inquiry was irrelevant to the two alleged grounds— abandonment and failure to assume parental responsibility—based on the substance of the applicable jury instructions. She also asserts that the testimony at issue constituted prohibited "other acts evidence" under WIS. STAT. § 904.04, and that a reasonably competent trial attorney would have objected to the testimony and sought a mistrial based on its entry into evidence at trial.

¶16　Even if we assume Susan's counsel performed deficiently in each respect that she argues,[4] we conclude that counsel's performance did not prejudice

---

[4] We need not, and do not, decide whether Susan's counsel was deficient in all or even some of the ways Susan maintains. Still, we note that he did object to the "Dawn does not want to go to Susan's home" testimony, and counsel also relied on a previous, dismissed TPR action between the parties, in which the court had made certain pretrial rulings that the attorneys then agreed would apply in this case. In other words, Susan's counsel did challenge issues related to Susan's other children and their current circumstances and some prior issues with the children.

(continued)

Susan in her grounds-phase trial. A mere possibility of a different result is insufficient to demonstrate prejudice. Rather, Susan carries the burden of showing it is reasonably probable that a trial devoid of the objectionable evidence would have produced a different result. This she cannot do, largely because the evidence presented at the grounds trial overwhelmingly showed that Susan had no contact of any form with Dawn for at least a twenty-two month period, and that she had no good cause for that failure, especially during the times when she was not incarcerated.

¶17 Nowhere in Susan's appellate briefs does she address the overwhelming evidence that her conduct, in fact, constituted grounds for abandonment and failure to assume parental responsibility.[5] Susan's own testimony strongly established her lack of any contact with Dawn since a thirty-minute visit with the child in December 2015. Furthermore, ample evidence supports the jury's finding of grounds for termination, including that

---

Also, some of the testimony Susan finds objectionable was not improper "other acts" evidence, but rather was relevant to the issues raised at trial in relation to the pled grounds for termination. In this regard, Susan's conception of relevance is far too narrow. For example, it seems that the individual Dawn identifies as her "mom" and Dawn's not wanting to visit with Susan have a tendency to show that she lacks a connection with Susan, due to a lack of visiting or communicating with her and because Susan has not assumed parental responsibility.

However, given that Paul's appellate brief only advances a lack of prejudice argument as the basis for affirming the circuit court's decision—which itself was founded on a conclusion that Susan has failed to prove prejudice from counsel's alleged deficiencies—we need not and do not further address the deficiency prong.

[5] Susan argues the jury could have inferred that she assumed parental responsibility based on the mere fact that Dawn had lived with her and the child's father during the first two and one-half years of Dawn's life. We do not find this argument compelling in light of the standards contained in WIS. STAT. § 48.415(6), which describes what constitutes a "substantial parental relationship." We address Susan's asserted "good cause" defense to the abandonment ground later in this opinion. *See infra*, ¶22.

Susan: (1) did not know the names of Dawn's teachers and last talked to one of them when Dawn was in kindergarten; (2) was unaware of Dawn's correct grade in school; (3) last attended a parent-teacher conference for Dawn in 2015; (4) never got on the mailing list for Dawn's school; (5) never attended Dawn's gymnastics events; (6) did not assist Dawn in any of her doctor or dentist visits; (7) never gave gifts to Dawn for her birthdays or otherwise celebrated them with Dawn, and never provided any gifts to Dawn until after Susan's deposition in this case; (8) failed to pay her court-ordered child support; (9) had only one phone call with Paul about Dawn after December 2015 despite Susan knowing how and where to contact Paul and Dawn; and (10) during that time, never asked Paul about Dawn, including regarding her physical health, mental health, or dental work. The foregoing also occurred during times when Susan only lived one house away from Dawn. While Susan was incarcerated during some of the time at issue, there were significant amounts of time when she was free to visit, but she failed to do so or to contact Dawn.

¶18    Regarding prejudice, Susan first asserts that the admission of the allegedly improper other acts evidence is prejudicial as a matter of law. She cites a number of inapposite cases in support of this notion, including principally a Wisconsin Supreme Court case from 1903, *Paulson v. State*, 118 Wis. 89, 94 N.W. 771 (1903). These cases do not stand for the proposition Susan advances. Rather, they noted that the introduction of substantial "evidence of the defendant's bad character or commission of specific *disconnected acts* is prejudicial error" in criminal cases. *Hart v. State*, 75 Wis. 2d 371, 394-395, 249 N.W.2d 810 (1977) (discussing *Fischer v. State*, 226 Wis. 390, 399, 276 N.W. 640 (1937)) (emphasis added). While Susan states that the evidence at issue here fell into this category, she fails to explain that conclusory assertion, and none of the lines of inquiry

Susan challenges was disconnected from her parenting. We decline to find prejudice as a matter of law here.

¶19 Alternatively, Susan contends that the unfair prejudice attendant to improper other acts evidence is manifested in her case. She argues that the objectionable evidence was "inflammatory," it tainted Susan's character in a manner that affected the jury's view of all the other evidence, the "other acts" evidence was emphasized by both Paul's counsel and the GAL during their closing arguments, and she had a viable defense to each of the alleged grounds.[6]

¶20 None of these arguments withstands scrutiny. As an initial matter, and contrary to Susan's characterizations of the challenged testimony as being very damning, much of the testimony was relevant and fairly innocuous, especially in light of all the foregoing evidence. The individual Dawn identifies as her "mom" and Dawn's not wanting to visit with Susan are facts tending to show that she lacks a connection with Susan, which is relevant to the asserted grounds but also is less significant than Susan's overall failures to contact or parent Dawn. Moreover, the physical condition of Dawn and her belongings upon returning from Susan's care was relevant to the jury's assessment of parental responsibility. *See State v. Bobby G.*, 2007 WI 77, ¶45, 301 Wis. 2d 531, 734 N.W.2d 81 ("Failure to assume parental responsibility is established by proof that the parent has never had a substantial parental relationship with the child."); *see also* WIS. STAT. § 48.415(6)(b) (defining a "substantial parental relationship" as the "acceptance

---

[6] Susan also notes that because the circuit court did not strike the testimony or issue a curative jury instruction, there was a failure to mitigate the evidence's prejudicial effect. Because we do not conclude the admission of the evidence at issue met the *Strickland* standard for prejudice, the failure to mitigate prejudice is inconsequential.

and exercise of significant responsibility for the daily supervision, education, protection and care of the child," and providing factors to consider in determining whether such a relationship existed).[7]

¶21 We also disagree that the testimony noted above is "inflammatory" or otherwise likely to improperly taint the jury in its assessment of all the other evidence adduced at the trial regarding the asserted grounds for terminating Susan's parental rights to Dawn. Rather, it is consistent with the bulk of the trial testimony, which, as we have indicated, contains overwhelming evidence that Susan failed to communicate with Dawn and failed to develop a substantial parental relationship with her. Notably, Susan provides no analogous case authority in support of her arguments regarding the allegedly inflammatory and prejudicial nature of the evidence in this case.

¶22 Finally, as to Susan's assertions regarding her "good cause" defense, her evidence in support of Paul having limited her access to Dawn was minimal and largely uncorroborated. In finding grounds to terminate Susan's parental rights, the jury plainly rejected this testimony, a determination it could reasonably make. *See Gauthier v. State*, 28 Wis. 2d 412, 416, 137 N.W.2d 101 (1965) (holding that determining the credibility of witnesses and the weight to be given to their testimony are properly functions of the trier of fact).

---

[7] We do view Paul's testimony about Susan leaving another child with him overnight as being largely irrelevant to the issues at trial, although it was prompted by a question designed to respond to Susan's accusations that Paul had impeded Susan's efforts to contact Dawn. However, Paul's brief testimony regarding what occurred on that particular occasion was unlikely to cause prejudice in light of the other highly relevant and largely undisputed testimony regarding Susan's failures to contact or assume responsibility for Dawn.

¶23 Of the four lines of testimony to which Susan objects, the most troublesome seems to be that regarding the status of Susan's other children being in foster care. But, despite Susan's concerns about the relevancy of this testimony, it was Susan who initially injected the fact that all her children were in foster care, despite the question posed to her being only: "How many of those children live with you on a full-time basis?" This question did not inherently elicit improper evidence, as it did not necessitate an answer explaining that less than full-time living with Susan was due to foster placements, as opposed to, for example, voluntary spending of time with other persons, including family members. Susan's gratuitous testimony—which, after being offered, prompted a few follow-up questions from the petitioner—comes close to constituting invited error. *See State v. Gary M.B.*, 2004 WI 33, ¶11, 270 Wis. 2d 62, 676 N.W.2d 475 (noting that a defendant cannot create error by deliberate choice and then receive the benefit of that error on appeal).[8]

¶24 In any event, while references to Susan's other children having been "taken away" and "removed" from her care were improper—and were relied upon by the GAL and Paul's counsel in closing—we conclude that Susan still has not proven prejudice in light of the overwhelming, uncontradicted evidence of Susan's failure to have any contact with Dawn for an extended period of time despite the

---

[8] Moreover, Susan's testimony that her other children were in foster care was not offered in a vacuum. Rather, her statement that they were "in foster care *until I am able to find housing*" was clearly designed to emphasize the reasons that Susan claimed not to be able to care for Dawn during the relevant time period. (Emphasis added.) This statement prompted further inquiry from the petitioner regarding the conditions for the children's return.

opportunity to do so, and her failure to develop a substantial parental relationship with Dawn.[9]

¶25    Because we reject Susan's argument asserting per se prejudice, and because she advances no other compelling argument for us to conclude she has met her burden of establishing prejudice based on her counsel's alleged failures, we conclude she has failed to satisfy her burden for establishing that her counsel was constitutionally ineffective.   There is no reasonable probability that, even absent the challenged testimony, the jury would have found that grounds for the termination of Susan's parental rights did not exist.

*II.    New Trial in the Interests of Justice*

¶26    Susan also argues that this court should exercise its authority under WIS. STAT. § 752.35 to grant a new trial in the interests of justice because the real controversy has not been fully tried.  *See **State v. Sugden***, 2010 WI App 166, ¶37, 330 Wis. 2d 628, 795 N.W.2d 456.  To prevail, Susan need not show a probable likelihood of a different result, only that the jury had before it evidence not properly admitted which so clouded a crucial issue that it may be fairly said that the real controversy was not fully tried.  ***Id.***  We exercise our power in this regard only in exceptional cases.  *See **id.***

¶27    Susan's argument for a new trial in the interests of justice is effectively derivative of her arguments, outlined above, that the four lines of

---

[9] Susan's only argument in reply to the prejudice issue is her assertion that Paul "inappropriately conflates a sufficiency of the evidence inquiry with a harmless error inquiry." This assertion does nothing to explain how there is a reasonable probability the result of the proceeding would have been different absent counsel's deficient performance. *See **Strickland v. Washington***, 466 U.S. 668, 694 (1984).

inquiry the jury heard constituted significant, prejudicial evidence that it should not have heard. In light of our foregoing analysis in the context of Susan's ineffective assistance of counsel arguments, we conclude there was no prejudicial error. Accordingly, the exercise of our discretionary reversal authority is not warranted.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.